IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLTON VAN SCOTT,<br><br>　　　　　Petitioner,<br><br>　　vs.<br><br>D. K. SISTO, Warden, California State Prison, Solano<br><br>　　　　　Respondent. | No. 2:08-cv-01020-JKS<br><br>MEMORANDUM DECISION |

　　Petitioner Carlton Van Scott, a state prisoner appearing *pro se*, filed a Petition for Habeas Corpus Relief Under 28 U.S.C. § 2254.  Scott is currently in the custody of the California Department of Corrections, incarcerated at the California State Prison, Solano.  Respondent has answered.  Scott has not replied.  Scott also requests that counsel be appointed.

I.  BACKGROUND/PRIOR PROCEEDINGS

　　In September 1987, following a trial by jury, Scott was convicted in the Los Angeles Superior Court of Murder in the Second Degree (Cal. Penal Code § 187(a)), with use of a firearm enhancement (Cal. Penal Code § 12022(B)).  The trial court sentenced Scott to an aggregate, indeterminate prison term of 16 years to life.  Scott does not challenge his conviction or sentence in this proceeding.[1]

---

[1] Scott's contention that his 1987 conviction was invalid was dismissed by this Court, and this action proceeds solely on the challenge to the 2006 denial of parole.  Docket No. 25.

In April 2006 Scott made his third parole-suitability appearance before the California Board of Parole Hearings ("Board").  After determining that Scott posed an unreasonable risk of danger to society or a threat to public safety, the Board found Scott unsuitable for parole.  Parole was denied for a period of five years.  Scott timely filed a petition for habeas relief in the Los Angeles Superior Court, which denied him relief in an unpublished, reasoned decision.  Scott's subsequent petition for habeas relief to the California Court of Appeal, Second Appellate District, was summarily denied without opinion or citation to authority.  The California Supreme Court similarly denied Scott's petition for habeas relief without opinion or citation to authority on March 19, 2008.  Scott timely filed his Petition for relief in the United States District Court for the Central District of California on April 7, 2008.  The Central District transferred the case to this Court.

The factual basis underlying Scott's conviction was summarized by the California Court of Appeal on direct appeal as follows:

> Linda Prescott's son had been killed by a drunk driver approximately one year before the events precipitating the matter at bar.  Another person injured in the accident had received a settlement check from the insurance company so Prescott was expecting to receive shortly a $60,000 settlement for the death of her son.  On the day of her own death, Prescott was in a good mood and planning to use the settlement funds to buy a car and a house and put a tombstone on her son's grave.  She was still sad about the death of her son but her attitude was generally upbeat.  Around 12:30 or 1:00 p.m. Prescott, who had a history of seizures, and a friend, Jacqueline Gibson, freebased cocaine at Prescott's home.  Prescott appeared to get high.
> 
> [Scott] appeared on the scene about 2:30 or 3:00 p.m.  He was on crutches because of an injured leg.  Prescott's roommate was sent to the store to buy [Scott] beer.  After a short time, Prescott and Gibson accompanied [Scott] to his residence down the street.  There Prescott and [Scott] got into a boisterous argument over money, [Scott] having given Prescott money to get his stereo out of hock and she having spent it on drugs.  The argument raged for 15 or 20 minutes before Gibson departed leaving Prescott and [Scott] alone.  When Gibson left, [Scott's] residence was "normal".

Approximately 40 minutes later, Gibson heard an ambulance and returned to [Scott's] residence. He was in handcuffs and paramedics were on the scene. The paramedics had arrived to find [Scott] dazed and incoherent. Prescott had suffered nearly three dozen blows and stab wounds with the fatal injury a stab wound in the heart. She had also suffered a stab wound to the eye. The residence was in complete disarray and there was blood on the floor and kitchen cabinets. A bent butcher knife with [Scott's] thumbprint on the blade was found at the scene. One of [Scott's] crutches was bent and had a reddish-brown substance on it. Prescott's blood alcohol level was .15 percent. Her body also contained cocaine and a prescription antidepressant drug.

The autopsy surgeon testified the stab wound to the eye had gone into the orbital tissues, cutting the eyelid and penetrating about an inch into the eye socket doing damage to bone surrounding the eye socket. Admitting "anything is possible", he said he had "not ever seen a suicide case where someone has stabbed themselves in the eye." He testified he would not be able to predict the behavior of a person under the combined influence of alcohol and cocaine but, "in my opinion, the pattern of injuries and the number of injuries and the location of the injuries on this decedent does not in any way resemble anything I have ever seen with a suicide."

[Scott] did not testify. A tape recording of his statement to police was introduced into evidence. He denied stabbing or striking Prescott except for an elbow to her mouth while trying to fend her off. His version of the incident was that Prescott attacked him during their argument and tried to stab him and hit him with his crutch. During the struggle they fell against an aquarium which broke, cutting Prescott. He took the knife away from her and got her in a bear hug. She got away from him, took the knife and went into the kitchen. She then went into a frenzy, stabbing and hitting herself and banging her head on various objects. He tried to stop her but could not. He went outside and asked someone to call the police. When he returned. Prescott was on the floor bleeding. Her wounds were self-inflicted.[2]

The Board's summary provides additional detail:

**PRESIDING COMMISSIONER FARMER:** Ok thank you. Now as I indicated I will start by reciting into the record a recitation of the offense. And I will indicate that I have reviewed the appellate transcript and that description of the offense. But for recitation into the record I will refer to the offense as it is described in the board report dated September 1996. Which summarizes the events as follows. Scott and the victim were in Scott's residence an argument issued, Scott repeatedly stabbed the victim with a knife with such force that it bent the knife. Scott also hit the victim with his aluminum crutch with such force that

---

[2] Docket No. 26-2, pp. 75-77.

3

it bent and broke the crutch. The neighbors called the police. When the police and paramedics arrived the victim was dead. The victim incurred 20 stab wounds, dying of a stab wound, which perforated her heart and left lung. (indiscernible) she was stabbed in the left eye. She suffered multiple superficial stab wounds, she suffered multiple blunt force lacerations, contusions and abrasions to her neck and face. The victim was ten weeks pregnant. Her blood alcohol was .15 percent, cocaine was found in her blood. Scott claimed that she had killed herself. Scott was placed under arrest. In that report it indicates that Carlton Scott denied killing the victim, stating quote it was a frame up closed [*sic*] quote. And then further indicates Mr. Scott was interviewed for this report on June 17, 1996 and Scott denied killing the victim stating I couldn't have done that. And there have been varying recitations of Mr. Scott's version of what occurred, one of the latest one appeared in the psychologist report of September 7, 2004. In which he stated under background information, as follows: Mr. Scott presented a long confusing and confounding story with a great deal of tangentially in regards to the circumstances of the commitment offense: However he never admitted culpability. He stated quite simply he felt he was set up. He stated that he knew the victim because he was a friend of a friend of hers. And that he tried to look out for her. He stated that he took her food and felt like he as [*sic*] friends with her. He stated he recalled the police asking him questions about the victim but it was quote all blur for me. I don't recall stabbing her. I don't know what happened close quote. And he stated he does not believe that he did it. He stated that he had been taking a medication and that, and had been drinking alcohol. He stated the combination of the medication and alcohol caused him to suffer this amnesia clog. At any rate he intended to state he did not believe he had committed the offense.[3]

## II.  GROUNDS RAISED/DEFENSES

In his Petition, Scott contends the Board denied him his constitutional rights to a hearing and jury trial under Cal. Penal Code §§ 2962 and 2966;[4] and erred by finding that he failed to

---

[3] Docket No. 26-2, pp. 169-71.

[4] Except as discussed in Part III, below, the extent to which Scott argues the decision of the Board was contrary to California law, those arguments are beyond the purview of this Court in a federal habeas proceeding. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (it is presumed that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002). Scott's contention that the Board violated his rights under Cal. Penal Code §§ 2962 and 2966 fit within
(continued...)

"own[] up to his crime," i.e. accept responsibility; and that the gravity and nature of the crime did not qualify him for release. Scott further contends he was denied effective assistance of counsel. Respondent does not assert any affirmative defense.[5]

### III. DISCUSSION

A. **Appointment of Counsel**

There is no constitutional right to counsel in federal habeas proceedings.[6] Appointment of counsel is not required in a habeas corpus proceeding in the absence of an order granting discovery or an evidentiary hearing.[7] This Court may appoint counsel under the Criminal Justice Act in this case if the Court determines that the interests of justice so require.[8] The Court does not so determine. Scott's request for the appointment of counsel is, therefore, DENIED.

B. **Denial of Parole**

In denying Scott parole, the Board held:

---

[4](...continued)
that category. This Court also notes that those sections are part of the Mentally Disordered Offender Act, Cal. Penal Code §§ 2960, *et seq.*, which applies to conditions to be imposed at the time of the prisoner's release to parole status upon prisoners having a treatable, severe mental disorder that was an aggravating factor in the commission of the crime. It is not a factor to be considered in the decision of whether to grant parole. *See People v. Sheek*, 19 Cal. Rptr.3d 737, 738 (Cal. App. 2004). Thus, this Court does not reach that issue.

[5] *See* Rules—Section 2254 Cases, Rule 5(b).

[6] *See Lawrence v. Florida*, 549 U.S. 327, 336-37 (2007) (citing *Coleman v. Thompson*, 501 U.S. 722, 756-57 (1991).

[7] *See* Rules—Section 2254 Cases, Rules 6(a), 8(c).

[8] 28 U.S.C. § 2254(h); 18 U.S.C. § 3006A(a)(2)(B); *see Weygandt v. Look*, 728 F.2d 952, 954 (9th Cir. 1983) ("In deciding whether to appoint counsel in a habeas proceeding, the district court must evaluate the likelihood of success on the merits as well as the ability of the petitioner to articulate his claims *pro se* in light of the complexity of the legal issues involved.").

      **PRESIDING COMMISSIONER FARMER:** Ok we are here for a decision in the matter of Carlton Scott, D-67202. Mr. Scott the panel has considered all the information received today at your hearing, contained in your file, your responses to the questions that you were asked, the arguments of counsel we considered all of the above. We relied upon all of the above information. And the specific factors which I will state in concluding that you are not suitable for parole. That you oppose [*sic*] and unreasonable risk of danger to society or a threat to public safety if released. Our analysis starts with an examination of your commitment offense, which was aggravated by the especially callous nature or the aggravated aggressive manner in its commission. The offense was carried out in a manner, which demonstrates an exceptionally callous disregard for human suffering. This was obviously a very violent death, which took place over a period of time. The motive is unclear to us, what is most disturbing is your inability or unwillingness to come to an understanding of your role in what happened. There are varying stores [*sic*] being told and your denial of responsibility and it obviously the jury found you otherwise. And looking at your juvenile history, your prior history what is notable about that is the documented one juvenile case for theft and an adult conviction for robbery, strong-armed. But similarly what is most disturbing about those offenses is your denial of responsibility for those manners [*sic*]. Given the commitment offense and that background and your institutional behavior first looking at the disciplinaries and you have had some difficulties and some successes. Some successes and some difficulties in the institution in the area of disciplinaries, we total 11 115's in total. Four of which, the last four were since your last hearing. So you seem to have some difficulty abiding by the rules of the institution, calculating less serious 128's and the last one of those was in 2005. We have fully considered the psychological report of Doctor Rouse dated August 24, 2004. Which documents your psychiatric problems and his recommendation is that you be in a facility in which you are closely monitored. And can be dealt with in that circumstance. You know we recognize you are making attempts to do as well as you can. We appreciate that going to AA is important we commend you for that. You know trying to get your GED, that is important. You know it is obvious by looking at your psychological reports you are up for some problems. And you are trying hard to work with those. But until we can see a greater level of success within the institution we are going to have a tough time recommending you go to the outside.

      **INMATE SCOTT:** All right.

      **PRESIDING COMMISSIONER FARMER:** So because of both the enormity of the crime and your background and continued problems and the length of time we think it is going to take to deal with those matters in a separate decision the hearing panel finds it is not reasonable to expect that parole would be granted in a hearing during the following five years. We will deny you for that period of time. In arriving at the decision we have also considered the representative from the Los Angeles District Attorney's office. (indiscernible) we

>
> appreciate your attempts to try to follow the recommendations it is just at given your difficulties you need to continue to work hard to not get any disciplinaries. And work with the psychologist to try and get a great understanding as you can of what caused these difficulties.  Take your medicine, follow there directions, work hard in going to therapy, work hard trying to complete these vocations we note that we are looking at vocational upholstery, Commissioner had some concern that, that was actually completed, in looking at the documents.  Your parole plans you talk about what your desires are but you don't have any documents to support that.  You need letters.
>     **INMATE SCOTT:**  Ok.
>     **PRESIDING COMMISSIONER FARMER:**  So hopefully things are working out for you ok here.  And we appreciate the efforts of your trying to work at improving yourself and we can just encourage you to continue on that path and wish you good luck sir.
>     **INMATE SCOTT:**  All right thank you.
>     **PRESIDING COMMISSIONER FARMER:**  I will turn it over to my colleague for some addition comments.
>     **DEPUTY COMMISSIONER NIELSEN:**  Wish you good luck
>     **PRESIDING COMMISSIONER FARMER:**  Ok, keep pitching Mr. Scott,. take care.
>     **INMATE SCOTT:**  All right, you too.[9]

Scott's arguments with respect to the decision of the Board for the most part address his initial premise, i.e., that the Board violated the California Mentally Disordered Offender Act ("MDOA").[10]  As noted above, the MDOA, which addresses conditions to be imposed upon release, is inapplicable to the question of whether the Board properly denied Scott parole. Consequently, the extent to which Scott's arguments are applicable to the Board's denial of parole is somewhat difficult to ascertain.  That is, it is unclear on just what basis Scott contends that the Board erred.  Therefore, this Court will assume Scott contends that the decision was unsupported by "some evidence," and will review the decision of the Los Angeles Superior Court in that light.  The Los Angeles Superior Court held:

---

[9] Docket No. 30, pp. 4-7.

[10] Cal. Penal Code §§ 2960 *et seq*.

[. . . .] The record reflects that on August 4, 1986, [Scott] and the victim, who was ten weeks pregnant, were involved in an altercation over money. Ultimately, [Scott] stabbed and struck the victim multiple times with a knife and a crutch. The victim died as a result of a fatal stab wound to the heart and left lung.

The Board found [Scott] unsuitable for release on parole after a parole consideration hearing held on April 11, 2006. [Scott] was denied parole for five years. The Board concluded that [Scott] was unsuitable for release on parole and would pose an unreasonable risk of danger to society and a threat to public safety. The Board based its decision on several factors including the circumstances of the commitment offense, [Scott's] criminal history, his past and present mental state, and his disciplinary record while incarcerated.

The Court finds that there is some evidence to support the Board's finding that the commitment offense was committed in an especially cruel manner in that the offense was carried out in a manner that demonstrated an exceptionally callous disregard for human suffering and the motive for the crime was inexplicable in relation to the offense. Cal. Code Regs., tit. 15, § 2402(c)(l)(D) and (c)(l)(E). The record reflects that [Scott] and the victim were at [Scott's] residence when they began arguing over money. The victim suffered multiple blows and stab wounds, which resulted in her death. [Scott] hit the victim with an aluminum crutch with such force that the crutch broke. [Scott] also stabbed the victim with such force that the knife bent. The victim incurred approximately twenty stab wounds. She was stabbed in the eye, heart and lung. She also suffered multiple lacerations, contusions and abrasions on her face and neck. When the police and paramedics arrived at the scene, the victim was dead. The offense was especially aggravated in that the victim was ten weeks pregnant.

In making its decision, the Board took into consideration [Scott's] previous criminal record, as well as his past and present mental state. [Scott] has failed to profit from previous attempts to correct his criminality. The record reflects that [Scott] has a criminal record that began at the age of 17 when he was placed on home probation for grand theft auto. As an adult, [Scott] was convicted of strong-armed robbery and sentenced to imprisonment in the county jail and probation. With regard to [Scott's] past and present mental state, the Board considered various psychological reports. In a report dated September 1999, the psychologist noted that [Scott] has been previously hospitalized for psychiatric reasons. [Scott] has been variously diagnosed with schizophrenia, psychosis and personality disorder issues. The psychologist noted that [Scott] has benefited [*sic*] from his structured environment, and that in a less structure environment [Scott]'s psychiatric problems will likely begin to resurface. In a more recent report dated September 2004, the psychologist noted that [Scott] has a number of high risk factors for violence and that such factors cause [Scott] to be perceived as "unpredictable as it relates to his risk of dangerous [*sic*]."

While [Scott's] criminal history and psychological reports, alone, may not justify a finding of unsuitability, the Board may properly consider these factors as

relevant to determining whether [Scott] is suitable for release on parole. Cal. Code Regs., tit. 15, § 2402(b).

The Court finds that there is some evidence to support the Board's finding that [Scott] committed several disciplinary violations while incarcerated. The Board may consider whether the inmate has "engaged in serious misconduct in prison or jail" as a factor tending to show unsuitability for release on parole. Cal. Code Regs., tit. 15, § 2402(c)(6). The record reflects that [Scott] has received a total of eleven 115s, which includes violations for failing to comply with grooming standards, smoking in a state building, and disobeying a direct order. The Board noted that four of [Scott's] violations have occurred since his last parole hearing. [Scott's] rather recent violations demonstrate that he has difficulty abiding by established rules.

The Court rejects arguments raised by [Scott] relating to issues that should be resolved by way of an appeal. See *In re Harris* (1993) 5 Cal. 4th 813.[11]

After briefing in this case was completed, the United States Court of Appeals for the Ninth Circuit, sitting en banc, decided *Hayward v. Marshall*.[12] This Court must decide the case on the law as it exists at the time it renders its decision, and if the law changes while the case is pending, this Court applies the new rule.[13] Thus, although it establishes a new rule, the holding in *Hayward* is controlling.

In this case, this Court "need only decide whether the California judicial decision approving the [Board's] decision rejecting parole was an 'unreasonable application' of the California 'some evidence' requirement, or 'was based on an unreasonable determination of the facts in light of the evidence.'"[14] By its reference to 28 U.S.C. § 2254(d), the Ninth Circuit implicitly, if not explicitly, directed this Court to apply § 2254(d) to the decisions of the

---

[11] Docket No. 26-3, pp. 2-3.

[12] 603 F.3d 546 (9th Cir. 2010) (en banc).

[13] *See Thorpe v. Housing Authority of City of Durham*, 393 U.S. 268, 281-82 (1969); *Lambert v. Blodgett*, 393 F.3d 943, 973 n.21 (9th Cir. 2004).

[14] *Hayward*, 603 F.3d at 563 (footnotes citing 28 U.S.C. § 2254(d) omitted).

California Supreme Court, using the same standards applied to the determination of the law as established by the United States Supreme Court.

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time the state court renders its decision or "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."[15] The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."[16] When a claim falls under the "unreasonable application" prong, a state court's application of Supreme Court precedent must be objectively unreasonable, not just incorrect or erroneous.[17] The Supreme Court has made clear that the objectively unreasonable standard is a substantially higher threshold than simply believing that the state court determination was incorrect.[18] Consequently, it appears that under the mandate of *Hayward*, this Court must canvas and apply California law as it existed at the time of the state court decision to the facts in the record as presented to the state court.

---

[15] 28 U.S.C. § 2254(d); *see Williams v. Taylor*, 529 U.S. 362, 404-06 (2000); *see also Lockyer v. Andrade,* 538 U.S. 63, 70-75 (2003) (explaining this standard).

[16] *Williams*, 529 U.S. at 412.

[17] *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (internal quotation marks and citations omitted).

[18] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

The mandate in *Hayward* is that this Court must review the decisions of state courts applying state law—in effect serving as a super-appellate court over state-court decisions. This requirement is in tension with the holdings of the Supreme Court. It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law.[19] "[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."[20] This principle applied to federal habeas review of state convictions long before AEDPA.[21] A federal court errs if it interprets a state legal doctrine in a manner that directly conflicts with the state supreme court's interpretation of the law.[22]

Respondent argues that California prisoners have no liberty interest in parole, and that if they do, the only due process protections available are a right to be heard and a right to be informed of the basis for the denial.[23] That is, Respondent contends that there is no due process

---

[19] *See Estelle*, 502 U.S. at 67-68 (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. at 653 (it is presumed that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002); *see also Engle v. Isaac*, 456 U.S. 107, 119 (1982) (challenging the correctness of the application of state law does not allege a deprivation of federal rights sufficient for habeas relief); *Bell v. Cone,* 543 U.S. 447, 455 (2005) (a federal court may not lightly presume that a state court failed to apply its own law).

[20] *Bradshaw v. Richey,* 546 U.S. 74, 76 (2005); *see West v. AT&T,* 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . .").

[21] *See Mullaney v. Wilbur,* 421 U.S. 684, 691 (1975) ("state courts are the ultimate expositors of state law").

[22] *See Bradshaw*, 546 U.S. at 76-78 ("Because the Sixth Circuit disregarded the Ohio Supreme Court's authoritative interpretation of Ohio law, its ruling on sufficiency of the evidence was erroneous.").

[23] *See Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1,
(continued...)

11

right to have the result supported by sufficient evidence. Because it is contrary to binding Ninth Circuit law,[24] Respondent's argument is without merit.

At the time that the Board and the California courts rendered their decisions, the California "some evidence" rule was embodied in *In re Rosenkrantz*[25] and *In re Dannenberg*.[26] Subsequently, the California Supreme Court, applying *Rosenkrantz* and *Dannenberg*, decided *In re Lawrence*[27] and *In re Shaputis*.[28]

In *Rosenkrantz*, the California Supreme Court held:

> [. . . .] Due process of law requires that [the Board's] decision be supported by some evidence in the record. Only a modicum of evidence is required. Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the [Board]. [. . . .] [T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the [Board] . . . . It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the [Board's] decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the [Board's] decision.[29]

---

[23](...continued)
15 (1979).

[24] *See Pirtle v. California Bd. of Prison Terms*, 611 F.3d 1015, 1020 (9th Cir. 2010); *Cooke*, 606 F.3d at 1213-14 (citing *Hayward*, 603 F.3d at 561-64); *Pearson*, 606 F.3d at 610-11 (same).

[25] 59 P.3d 174 (Cal. 2002).

[26] 104 P.3d 783 (Cal. 2005).

[27] 190 P.3d 535 (Cal. 2008).

[28] 190 P.3d 573 (Cal. 2008).

[29] *Rosenkrantz*, 59 P.3d at 218. Quoted with approval in *Shaputis*, 190 P.3d at 585.

The California Supreme Court then held:

> The nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole. (Citations omitted.)  Although the parole authority is prohibited from adopting a blanket rule that automatically excludes parole for individuals who have been convicted of a particular type of offense, the authority properly may weigh heavily the degree of violence used and the amount of viciousness shown by a defendant.  [. . . .]
>
> In some circumstances, a denial of parole based upon the nature of the offense alone might rise to the level of a due process violation—for example where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense.  Denial of parole under these circumstances would be inconsistent with the statutory requirement that a parole date normally shall be set "in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public . . . ." (Pen.Code, § 3041, subd. (a).)  "The Board's authority to make an exception [to the requirement of setting a parole date] based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is 'normally' to be granted. Otherwise, the Board's case-by-case rulings would destroy the proportionality contemplated by Penal Code section 3041, subdivision (a), and also by the murder statutes, which provide distinct terms of life without possibility of parole, 25 years to life, and 15 years to life for various degrees and kinds of murder. (Pen. Code, § 190 et seq.) [¶]  Therefore, a life term offense or any other offenses underlying an indeterminate sentence must be particularly egregious to justify the denial of a parole date." ( Citation omitted.)[30]

In *Dannenberg* the California Supreme Court explained:

> [. . . .]  So long as the Board's finding of unsuitability flows from pertinent criteria, and is supported by "some evidence" in the record before the Board [citing *Rosenkrantz*], the overriding statutory concern for public safety in the individual case trumps any expectancy the indeterminate life inmate may have in a term of comparative equality with those served by other similar offenders. Section 3041 does not require the Board to schedule such an inmate's release when it reasonably believes the gravity of the commitment offense indicates a

---

[30] *Id.* at 222; *see Shaputis*, 190 P.3d at 584-85 ("The record supports the Governor's determination that the crime was especially aggravated *and*, importantly, that the aggravated nature of the offense indicates that the petitioner poses a current risk to public safety." (emphasis in the original)).

continuing danger to the public, simply to ensure that the length of the inmate's confinement will not exceed that of others who committed similar crimes.[31]

The California Supreme Court then held:

> Thus, there clearly was "some evidence" (citing *Rosenkrantz*) to support the Board's determination that Dannenberg's crime was "especially callous and cruel," showed "an exceptionally callous disregard for human suffering," and was disproportionate to the "trivial" provocation. Accordingly, under *Rosenkrantz,* the Board could use the murder committed by Dannenberg as a basis to find him unsuitable, for reasons of public safety, to receive a firm parole release date.[32]

The Board must, however, "point to factors beyond the minimum elements of the crime for which the inmate was committed" that demonstrate the inmate will, at the time of the suitability hearing, present a danger to society if released.[33] The Board "may credit evidence suggesting the inmate committed a greater degree of the offense than his or her conviction evidences."[34] In *Lawrence*, however, the California Supreme Court rejected the argument "that the aggravated circumstances of a commitment offense inherently establish current dangerousness," holding:

> [W]e conclude that although the Board and the Governor may rely upon the aggravated circumstances of the commitment offense as a basis for a decision denying parole, the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of

---

[31] *Dannenberg*, 104 P.3d at 795.

[32] *Id.* at 803.

[33] *Id.* at 786-87, 802-803; *see Rosenkrantz*, 59 P.3d at 222.

[34] *Dannenberg*, 104 P.3d at 803 n.16 (citing *Rosenkrantz*, 59 P.3d at 219).

the commitment offense remain probative to the statutory determination of a continuing threat to public safety.[35]

This Court must, therefore, determine whether the decisions of the California courts upholding the Board's denial of parole complied with California law as expressed in *Lawrence* and *Shaputis*. Because state court judgments carry a presumption of finality and legality, Scott has the burden of showing by a preponderance of the evidence that he merits habeas relief.[36] Under AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.[37] This presumption applies to state trial courts and appellate courts alike.[38] Both the subsidiary findings on the applicable factors and the ultimate finding of some evidence constitute factual findings.[39]

With respect to the underlying commitment offense, the applicable regulation provides:

(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:
    (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
    (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
    (C) The victim was abused, defiled or mutilated during or after the offense.
    (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

---

[35] *Lawrence*, 190 P.3d at 554-55; *see Cooke*, 606 F.3d at 1214.

[36] *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002); *see Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam) (stating that a federal court cannot grant "habeas relief on the basis of little more than speculation with slight support").

[37] 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

[38] *Stevenson v. Lewis*, 384 F.3d 1069, 1072 (9th Cir. 2004).

[39] *Cooke*, 606 F.3d at 1216.

(E) The motive for the crime is inexplicable or very trivial in relation to the offense.[40]

The evidence clearly supports a finding that this case falls within the scope of (1)(D) and (1)(E), and probably 1(C).[41]  Under California law, a court neither re-weighs the evidence nor substitutes it's discretion for that of the Board.  Judicial review of a decision denying parole is "extremely deferential."[42]  Thus, under *Rosenkrantz* and *Dannenberg*, this Court could not say that the decision of the Los Angeles County Superior Court was contrary to, or involved an unreasonable application of California law at the time it was decided, or was based on an unreasonable determination of the facts in light of the evidence.  On the other hand, because *Hayward*, *Pearson*, and *Cooke* require that *Lawrence* and *Shaputis* be applied, this Court must look to determine whether there was some factor in addition to the underlying commitment offense to support denial of parole.

As the Los Angeles Superior Court noted, the 2004 psychological report indicated that Scott's risk of dangerousness was unpredictable.  This additional factor is sufficient to support a determination that Scott posed an unreasonable risk of danger to society or a threat to public safety.[43]  The Board and the Los Angeles Superior Court also noted that Scott had recent disciplinaries, which indicated a difficulty in following the rules.  This too may be a sufficient

---

[40] Cal. Code Regs., tit. 15, § 2402(c).

[41] This Court also notes that § 2402(c)(1)(A) (multiple victims) may also apply to this case.  *See* Cal. Penal Code § 187(a) (including the killing of a fetus as constituting murder); *People v. Davis*, 872 P.2d 591, 597-99 (Cal. 1994) (including within the scope of § 187(a) the death of a fetus in the post-embryonic stage, i.e., more than seven to eight weeks after fertilization).

[42] *Rosenkrantz*, 59 P.3d at 210.

[43] *See Hayward*, 603 F.3d at 563.

basis for for finding Scott posed an unreasonable risk to society.[44] Although not noted by the Los Angeles County Superior Court, the Board was concerned with Scott's failure to come to an understanding of his role in the crime. This is also an adequate additional factor to support a finding that Scott posed an unreasonable risk to society.[45] Applying *Lawrence* and *Shaputis*, this Court cannot say that the decision of the Los Angeles County Superior Court was contrary to, or involved an unreasonable application of California law at the time it was decided, or was based on an unreasonable determination of the facts in light of the evidence.[46] Scott is not entitled to relief under this ground.

### C.     Ineffective Counsel

Scott argues that counsel was ineffective for not objecting to the Board's decision, asserting Scott's right to jury trial or hearing before a judge or tribunal, and the right to have expert testimony for his defense. Because Scott has failed to establish a right, whether under California law or the United States Constitution, to a jury trial or the right to present expert testimony in a parole-suitability hearing, the failure of counsel to raise those issues was not ineffective. Scott is not entitled to relief on the basis of ineffective counsel.[47]

---

[44] *See Lawrence*, 190 P.3d at 541, 565 (apparently emphasizing the fact that the prisoner was discipline-free for a number of years); *Shaputis*, 190 P.3d at 577 (same). Court notes, however, that because the described disciplinaries did not include any disciplinaries involving violence, its relevance as an additional factor is questionable.

[45] *Shaputis*, 190 P.3d at 575, 581, 585.

[46] Although it is not clear, it appears that Scott may also be arguing that the Board was required to find the elements of unsuitability beyond a reasonable doubt. To the extent that Scott so contends, that contention is rejected as being without merit. All that is required is "some evidence." *Hayward*, 603 F.3d at 563.

[47] *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Hill v. Lockhart,* 474 U.S. 52, 57
(continued...)

IV.  CONCLUSION AND ORDER

Scott is not entitled to relief on any basis raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the request for the appointment of counsel is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.[48]  Any further request for a Certificate of Appealability must be addressed to the Court of Appeals.[49]

The Clerk of the Court is to enter final judgment accordingly.

Dated:  January 10, 2011.

/s/ James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
United States District Judge

---

[47](...continued)
(1985).

[48] 28 U.S.C. § 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (a COA should be granted where the applicant has made "a substantial showing of the denial of a constitutional right," *i.e.,* when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further") (internal quotation marks omitted).

[49] *See* Fed. R. App. P. 22(b); Ninth Circuit R. 22-1.